SENTARA HAMPTON GENERAL
HOSPITAL, Plaintiff,

v.

Louis W. SULLIVAN, M.D., Secretary,
Department of Health and Human
Services, Defendant.

Civil A. No. 89–1248.

United States District Court,
District of Columbia.

May 24, 1991.

Mary Susan Philp, Ronald Nelson Sutter, Powers, Pyles & Sutter, P.C., Washington, D.C., for plaintiff.

Robert Lloyd Roth, Dept. of Health & Human Services, OGC–HCFA, Baltimore, Md., for defendant.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This case comes before the court on the parties' cross-motions for summary judgment.

The controversy here involves plaintiff hospital's 1984 claim for Medicare reimbursement for interest incurred as a result of borrowing $14,675,000.00 for a capital project without using the $3,480,575.00 fund designated for spending on capital projects. The court finds that the hospital must forfeit most of its claim for interest expense reimbursement for 1984 since it failed to use the designated capital fund account first.

I. *Background*

 A. The 1982 ICU/CCU construction plan

Plaintiff Sentara–Hampton General Hospital ("Hampton") is a non-profit acute care

hospital in coastal Virginia. The hospital enjoys certification to participate in the Medicare program.[1] *Defendant's Statement of Material Facts ("Def. Stmt.")* at ¶ 1 (Jan. 16, 1990); *see* 42 U.S.C. § 1395cc (1988) (certified hospitals must agree to charge Medicare patients only for services rendered and notify HHS Secretary of administrative changes).

In 1979–80 Hampton's Board of Trustees approved a long-term capital improvement plan, which included construction of an intensive care unit and a critical care facility. *Plaintiff's Statement of Material Facts ("Pltf. Stmt.")* at 4, ¶ 14 (Nov. 27, 1989). When the Board was ready to begin construction in April 1982, it expected the project to cost $15,681,002.00. *Pltf. Stmt.* at 15.

Like any consumer planning a large purchase, the Hampton Board needed to minimize its interest costs while keeping installment payments manageably low. Hampton here could plan its construction to maximize Medicare reimbursement for all of their "necessary and proper expenses incurred in furnishing services, such as administrative costs, maintenance costs, and premium payments" that they incur in serving Medicare patients. 42 C.F.R. § 413.13(c)(3) (1989). *See also* 42 U.S.C. § 1395ww(a) (1988). Since Congress requires the Health Care Financing Administration ("HCFA")[2] to avoid both subsidization of expenses that non-Medicare patients incur and non-Medicare patient shouldering of Medicare expenses, HCFA will reimburse the cost of new construction to the extent that Medicare patients will occupy the new building just as it will pay traditional medical bills.[3]

Since hospitals like Hampton frequently must renovate their old buildings and buy new equipment simply to maintain their state accreditation, the Medicare program includes special construction financing incentives. Among them is a regulation permitting hospitals to create funded depreciation accounts ("FDAs"), which are savings accounts that a hospital must spend exclusively for replacement and renovation of capital assets. 42 C.F.R. § 413.143(e).[4] In

---

1. "The insurance program for which entitlement is established ... provides basic protection against the costs of hospital, related post-hospital, home health services, and hospice care in accordance with this part" for individuals over 65, their dependents, and those with end-stage renal disease. 42 U.S.C. § 1395c (1986).

2. HCFA is the HHS division charged with administering the Medicare program.

3. Medicare also will not reimburse hospitals for any costs attributable to non-Medicare patients, known as the bar on cross-subsidization. R. Buchanan, J. Minor: *Legal Aspects of Health Care Reimbursement* (1985) at 45. To effect such a bar, the statute states that HHS regulations must "take into account both direct and indirect costs of providers of services .. in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs .. will not be borne by individuals not so covered."

4. The provision at issue, PRM § 226, issued in January 1983, states the following:
 "FUNDED DEPRECIATION:
 Funding of depreciation is the practice of placing funds, including nonborrowed bond reserve and sinking funds, in a segregated account(s) for the acquisition of depreciable assets used in rendering patient care or for other capital purposes related to patient care.

Other capital purposes include capital debt liquidations, such as principal payments for bonds and mortgages and nonborrowed bond reserve and sinking funds to the extent used for a capital purposes, provided that they meet all the requirements of § 226F. Funds deposited in the funded depreciation account must be placed in readily marketable investments of the type that assures the availability and conservation of the funds. Income earned on investments which do not meet this condition must be offset against allowable interest expense.
 Although funding of depreciation is not required, it is strongly recommended that providers use this mechanism as a means of conserving funds for acquisition of depreciable assets as described above.
 C. *Restrictions.*–Funded depreciation (total market value of fund) must be available (unless contractually committed as noted below) on an as needed basis for the acquisition of the provider's depreciable assets used to render patient care, or for other capital purposes related to patient care ... Funds are considered available unless committed, by virtue of contractual arrangements, to the acquisition of depreciable assets used to render patient care, or to other capital purposes. Borrowing for a purpose intended by funded depreciation is unnecessary to the extent funded depreciation is available. Thus, interest expense for borrowing up to the

return for the hospital spending the FDA exclusively upon capital projects, HCFA omits the interest that the funds accumulate from the hospital's annual earnings since the earnings reduce the hospital's total annual cost which then reduces Medicare reimbursement, as follows:

$$\frac{\text{Total cost of routine services}}{\text{Total number of inpatient days}} \times \frac{\text{Medicare}}{\text{inpatient days}} = \frac{\text{Annual}}{\text{reimbursement}}$$

*St. Mary of Nazareth Hospital Center v. Heckler,* 760 F.2d 1311, 1314 (D.C.Cir.1985) (Interest earned on all accounts *but* FDAs reduce the fraction's numerator—"cost of routine services"—which in turn reduces annual reimbursement).

---

Not only must the hospital spend the FDA exclusively upon capital projects, but, to minimize the Medicare program's liability for interest expense reimbursement, the hospital also must use the fund to reduce borrowing for capital projects. HCFA executes the plan by:

1) noting the project cost

2) looking to see the amount of FDA available at the time the hospital makes its borrowing decision

3) noting how much the hospital borrows, and

4) deeming the borrowing unnecessary to the extent that the hospital has FDA monies available which it does not spend upon the project.

When HCFA determines the necessity of borrowing (step # 4), Medicare regulations require that the interest expense be both "proper"—incurred in giving patient care, 42 C.F.R. § 413.153(a)(1), and necessary:

"(i) Incurred on a loan made to satisfy a financial need of the provider. Loans that result in excess funds or investments would not be considered necessary;

(ii) Incurred on a loan made for a purpose reasonably related to patient care; and

(iii) Reduced by investment income except if such income is from gifts or grants, whether restricted or unrestricted, and that are held separate and not commingled with other funds. Income from funded depreciation or a provider's

amount of available funded depreciation is not

qualified pension fund is not used to reduce interest expense."

42 C.F.R. § 413.153(b)(2).

Controversy and confusion arise in applying this "financial need/necessary" provision because even the hospitals that have created FDAs often need to borrow by issuing bonds when they commence major construction projects. True to that pattern, Hampton has claimed that it needed to borrow the entire cost of the ICU/CCU construction by issuing $14,675,000.00 in tax exempt bonds to satisfy a "financial need," while HCFA countered argue that Hampton did not have a financial need that included the $3,480,575.00 in its FDA. *Pltf. Stmt.* at ¶ 16. However, since the hospital's Certificate of Need required completion of the project during 1984, the Board voted to use $500,000.00 from the FDA to create a contingency account which it could use should the ICU project expenses exceed the $403,000.00 from the borrowed funds already set aside. *Id.* at ¶ 8.

To buttress its reimbursement claim, the plaintiff has added that the Board in 1982 expected to satisfy the following obligations by 1985 in addition to completion of the ICU/CCU:

1) a $1.5 million balloon payment due in 1985 on a 1975 bond issue

2) the cost of renovating the hospital's third floor

3) Purchase of new CAT scanner

an allowable cost."

4) Other capital expenditures discussed in long term plan between 1982 and 1985. *Pltf. Stmt.* at ¶ 17.

Yet even when the Board created the $500,000.00 contingency account and bought miscellaneous capital goods, the FDA still grew from 1982 through 1985:

| Fiscal Year | FDA Balance |
| --- | --- |
| 1982 | $4,918,449 |
| 1983 | $5,296,000 |
| 1984 | $6,158,000 |
| 1985 | $6,927,063 |

*Deft. Stmt.* at ¶ 9. Thus, Hampton paid the $1.5 million balloon payment in November 1985 and ended that fiscal year with an $6,927,063 FDA accumulation.

Since Medicare reimbursement regulations require hospitals to wait until a facility opens to apply for construction expense reimbursement, Hampton after the ICU opened in 1984 sought reimbursement for interest expense incurred on $13,194,425.00 of the 1982 borrowing.[5] *Deft. Stmt.* at ¶ 15. To receive the monies, Hampton submitted an annual cost report to a "fiscal intermediary," which is a private insurer acting on behalf of HCFA[6], with Blue Cross/Blue Shield of Virginia playing that role here. *See* 42 C.F.R. § 413.24(f) (content of report); 42 C.F.R. § 413.20(b) (reports submitted annually). *Id.* at § 413.20(d)(2).

Blue Cross audited the report using the Provider Reimbursement Manual ("PRM"), a set of transmittals that HHS sends to fiscal intermediaries and accountants who compose hospitals' annual cost reports. Blue Cross particularly focused upon the 1983 revision to the PRM at § 226, a provision which deemed FDA monies were "available" for spending on capital projects unless they are "contractually committed." *Pltf. Stmt.* at ¶ 18. The regulation was to apply to all cost reporting periods ending after December 31, 1982.

Applying the "contractual commitment" provision, the intermediary concluded that Hampton's intention to use $1.5 million from the FDA to pay the 1985 balloon payment on the 1975 bond issue was "a discussion of rainy day plans ... without any resolution or vote-taking." *Deft. Mtn.*, Ex. I at 9. Blue Cross also found that the $500,000 in the contingency fund was available, since the 1982 bond prospectus required its use only if overruns exceeded the $403,000.00 from the borrowed funds already set aside, a problem that never materialized. *Deft. Mtn.*, Ex. I at 9.

Finally, Blue Cross found that Hampton should have included among available FDA funds the amount of imputed interest that it would earn on the account ($2,240,000.00 from a separate construction fund and $533,010.00 from the FDA) between 1982–84. *Id.* at 11. The intermediary thus concluded that:

—Both the $500,000.00 from the FDA placed in the contingency account and the $1.5 million that the Board expected to spend on the 1985 balloon payment on the 1975 bond issue were available. *Deft. Stmt.* at ¶ 17. Thus, Hampton could not recover the interest expense incurred on borrowing this excess $2 million borrowed, which totalled $245,828.00.

—Since neither of Hampton's claimed commitments of FDA (creating the contingency fund for the 1982 borrowing and the balloon payment on the 1975 borrowing), the entire $3,480,575.00 in the FDA was available to finance the ICU/CCU construction project.

—Only $11,194,425.00 of the 1982 bond issue was necessary borrowing, which is the result of subtracting the available FDA funds from the total borrowed in 1982 ($14,675,000.00 borrowing—$3,480,575.00 FDA).

---

**5.** $14,675,000 borrowing − $1,480,575 available funds in FDA = $13,194,425.00

**6.** "If any group or association of providers of services wishes to have payments under this part to such providers made through a national, State, or other public or private agency or organization and nominates such agency or organization for this purpose, the Secretary is authorized to enter into an agreement with such agency or organization." An intermediary also may relay the Secretary's concerns to providers, pass providers' comments back to the Secretary, and audit providers' records to resolve cost report disputes. 42 U.S.C. § 1395h(a) (1988); *see also* 42 C.F.R. § 421.100.

*See* 42 C.F.R. § 405.1803(a)(1)(i) (1989) (Intermediary must calculate annual Medicare reimbursement "on the basis of reasonable cost for the report period covered by the cost report" and explain these conclusions to the hospital).

By deeming only $11,194,425 of the borrowing "necessary," the intermediary concluded that Medicare should not reimburse Hampton for its claimed $433,595.00 in interest expense. *Deft. Stmt.* at ¶¶ 17, 22.

### B. Provider Reimbursement Review Board decision

Hampton appealed the intermediary decision to the proper HHS administrative division known as the Provider Reimbursement Review Board ("PRRB"), which consists of five members that the HHS secretary appoints, including two medical service providers, a CPA, and others "knowledgeable in the field of payment of providers of services." 42 U.S.C. § 1395*oo*(h) (1988). The Board has jurisdiction to review cost report controversies involving over $10,000.00 if the provider seeks review within 180 days of receiving the fiscal intermediary's final report. *Id.*, § 1395*oo*(a).

Hampton in its first PRRB petition[7] claimed that the $500,000.00 set aside for the ICU/CCU completion contingency and $1,500,000.00 for the 1985 balloon payment for the 1975 bond issue were unavailable and asked for reimbursement of $245,828.00 interest incurred in borrowing that amount. *Deft. Mtn.*, Ex. I at 2.

The hospital admitted that it still had $1,480,575.00 in its FDA available to spend on the project in 1982 and did not claim $187,767.00 interest incurred in borrowing that amount. *Id.* Yet later, Hampton amended its complaint to claim that its entire $3,480,575 FDA was unavailable and sought reimbursement of a total of $433,595.00 interest incurred. *Deft. Mtn.*, Ex. I at 2.[8]

At a three-day evidentiary hearing during the summer of 1988, the PRRB closely examined the 1982 bond prospectus, Hampton's plans to renovate the third floor, buy a CAT scanner and other "major movable equipment," and make the $1.5 million balloon payment in 1985. *Pltf. Stmt.* at ¶¶ 18–20. In its January 9, 1989 opinion, the Board rejected the provider's argument that "changes in services, market conditions, and future reimbursement methods" affect whether borrowing is necessary, since "such factors by their very nature lack consistent standards and are susceptible to arbitrariness." *Deft. Mtn.*, Ex. I at 17. Applying this principle, the PRRB deemed the plaintiff's evidence concerning the hospital's fears of revocation of the tax exemption for bonds and cutbacks in the overall Medicare reimbursement rate irrelevant for determining whether a borrowing was necessary or not, yet concluded that the hospital had made contractual commitments of its FDA to purchase the following items:

| | |
|---|---|
| Balloon payment on 1975 issue | $1,500,000 |
| Contingency fund for 1982 bond issue | $ 500,000 |
| Pre-borrowing commitments for other capital expenditures | $ 727,703 [9] |
| Total unavailable funds | $2,727,703 |

FDA total of $3,480,575 − $2,727,703 unavailable = $752,872 unnecessary borrowing. No interest expense reimbursable on that amount. *Deft. Mtn.*, Ex. I at 18.

---

7. Since the intermediary and Hampton disagreed as to whether Hampton properly opened new rehabilitation beds, Hampton also sought greater reimbursement for amounts incurred in this unit. *Deft. Mtn.*, Ex. I at 11–16.

8. Since Medicare applies the reimbursement formula described earlier, the total "Medicare reimbursement effect" of the hospital's claim was only $173,000.00. *Deft. Mtn.*, Ex. I at 3.

9. This figure is the sum of:

| | |
|---|---|
| CAT scanner | $207,453 |
| Third floor renovation | $321,665 |
| Major movable equipment | $203,279 |
| | $732,397 |

Thus, the hospital could collect interest reimbursement on $13,922,128.00 ($14,575,-000.00 – $752,872.00). *Deft. Mtn.*, Ex. I at 19.

## C. HCFA Deputy Administrator's decision

The PRRB ruling becomes the final agency decision unless the HHS Secretary, or HCFA as the agency designate, within 60 days chooses to review the decision. 42 U.S.C. § 1395*oo*(a). Here, the HCFA Administrator by March 8, 1989 had reversed the PRRB decision. *Deft. Motion for Summary Judgment ("Deft. Mtn."),* Ex. H at 4.

Since the PRRB did not define "contractual commitment" in its opinion, HCFA decided to define it, as does Black's Law Dictionary, as an obligation arising from a contract or agreement. *Id.* at 4, *quoting* Black's Law Dictionary 397 (4th Ed.1968). Since the Hampton Board only expressed intent to use $1.5 million from the FDA on the 1985 balloon payment and provided invoices showing ongoing $727,713.00 capital improvements but no plain contract establishing the limits of the project, HCFA found that the FDA was not "contractually committed" and therefore was "available" for spending on the ICU/CCU project. *Id.* In contrast, HCFA found the 1982 bond offering prospectus was a contract to set aside $500,000 from the FDA, which thus created a "contractual commitment" sufficient to make those FDA funds unavailable. *Deft. Mtn.*, Ex. H at 4.

The Administrator also rejected the plaintiff's argument that hospitals cannot deplete their FDAs, or "go bare," for spending on capital projects and comport with Medicare requirement that hospitals act as prudent market participants that save for damp days:

"[the regulations do not require] that the Provider must withdraw all of its funded depreciation; only that it make a contractual commitment of those funds. Other-

wise, they must be considered as available." *Deft. Mtn.*, Ex. H at 5.

Thus, the Administrator found $2,980,-575.00 of the 1982 borrowing unnecessary, which reduced plaintiff's reimbursable interest expense accordingly. *Id.* Plaintiff's timely appeal brought the case before this Court for review of an agency decision pursuant to 5 U.S.C. § 706. *See* 42 U.S.C. § 1395*oo*(f) (1988).

## II. *Analysis*

The plaintiff chiefly argues that the Secretary improperly promulgated the January 1983 revision of PRM § 226, which deemed any FDA not "contractually committed" to be available for spending on capital projects. The plaintiff says that PRM § 226 has a substantial financial impact on hospitals and, as such, constitutes a legislative or substantive rule. Since the APA requires that agencies follow a notice and comment procedure before promulgating substantive rules, the plaintiff argues that mere transmittal of such a rule to intermediaries was improper and the rule invalid for failure to conform to APA requirements.

The defendant responds that PRM § 226 merely clarified a HHS policy stated in 1968, which deemed FDA monies available (and borrowing unnecessary to their extent) unless the hospital had, under the terms of a bond indenture, mortgage, or other lending agreement committed the fund to other projects. *Deft. Mtn.*, Ex. C at 9189 (*quoting* PRM § 226 (1968)). Since a clarification does not change the law substantively, PRM § 226 fell within the APA's interpretative rule exception to its notice and comment requirements.

Alternatively, the plaintiff contends that the PRRB and HCFA by adjudication between 1970 and 1983 promulgated a "prudence" standard, which deems FDA unavailable for spending on capital projects and thus all borrowing necessary if the

---

The PRRB then subtracted the value of an electrical generator that the hospital ordered after

April 15, 1982 ($732,397 – $4,694) to yield $727,703. *See Deft. Mtn.*, Ex. I at 18.

hospital depletion of all of its FDA on a particular project would be imprudent. The defendant counters that HCFA, which announces the final agency interpretation of Social Security/Medicare regulations, consistently had deemed FDA available for a particular project if it was not firmly committed to fund other ones.

Should the court find that the Secretary properly labelled PRM § 226 as an interpretative rule exempt from the APA's notice and comment requirements, the plaintiff argues that the Secretary acted arbitrarily and capriciously in applying it retroactively to a borrowing decision made in April 1982, seven months before issuance of the provision in January 1983. The defendant responds first that since PRM § 226 applies to cost reporting years after December 31, 1982 and the 1984 cost reporting year is here at issue, the rule has no retroactive effect at all. Alternatively, the defendant contends that the bar on agency retroactive application of its rules applies only to substantive rules, and the mere clarification of FDA commitment contained in PRM § 226 is not a substantive change.

Should the court find that the defendant could apply PRM § 226 to the 1984 cost reporting year, the plaintiff argues that the HCFA decision is not supported by substantial evidence in the administrative record. The plaintiff claims that HCFA improperly ignored evidence of contractual commitment of the FDA offered at the PRRB hearing, including the minutes of the Board of Trustees' meetings calling for spending the FDA to: 1) satisfy the $1.5 million balloon payment on the 1975 bond issue in 1985, 2) complete renovations of the hospital's third floor, and 3) purchase a CAT scanner. The defendant responds that HCFA properly concluded that the Board of Trustees' minutes did not create a contractual commitment of the FDA.

### A. Whether Secretary properly promulgated PRM § 226?

■ Here, the Secretary treated PRM § 226 as an informal interpretative rule by titling it simply "Transmittal No. 279" and sending it in January 1983 to Medicare intermediaries and providers.[10] Such informal rule announcement comports with the Administrative Procedure Act ("APA") only if the provision is neither a legislative nor substantive rule. The APA refers to these legislative and substantive rules as mere "rules," which it defines as follows:

> "[A RULE IS] the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing." 5 U.S.C. § 551(4) (1988).

If the agency statement is a legislative rule, the APA requires the agency to publish its terms and substance in the Federal Register, 5 U.S.C. § 553(b)(3) (1988), at least 30 days before its effective date, *id.* at § 553(c), accept public comments concerning the rule, and include a preamble in the final rule which states the regulation's

---

**10.** The 1968 PRM § 226 in relevant part stated the following:

[FDA purpose]: "Funding of depreciation is the practice of setting aside cash, or other liquid assets, in a fund separate from the general funds of the provider to be used for the replacement of the assets depreciated, or for other capital purposes.

[commitment of FDA]: Funding of depreciation by a provider may be required under the terms of a bond indenture, mortgage, or other lending agreement, in which the creditors restrict the use of such funds by the providers. In these situations, a trustee relationship is established by contract or agreement, wherein the provider is acting as a trustee in regard to the amounts required to be funded and the use of such funds as stipulated in the agreement ...

[Medicare encouragement of creating FDA]: Although funding of depreciation is not required, it is strongly recommended that providers use this mechanism as a means of conserving funds for replacement of depreciable assets, and coordinate their planning of capital expenditures with area wide planning activities of community and State agencies."

basis and purpose. Most often legislative rules grant agencies significant enforcement power to ban acts.[11]

■ The APA exempts non-legislative rules from the notice and comment requirement. Among the exempt rules are "general statements of policy or rules of agency organization, procedure or practice," 5 U.S.C. § 553(b)(3)(A), and "interpretative rules and statements of policy." 5 U.S.C. § 553(d)(2). Since the parties at bar are arguing over whether PRM § 226 is interpretative or not, the court finds Attorney General Tom Clark's statements early in the APA's career instructive. The Attorney General said that interpretative rules are "rules or statements issued by an agency to advise the public of the agency's construction of the statutes and regulations which it administers," while legislative rules are "statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise its discretionary power." *Attorney General's Manual on the APA* (1947). While interpretative rules may effectuate important public policy goals, they still are not legislative if they merely remind the public of existing duties, *Jerri's Ceramic Arts*, 874 F.2d at 207, without changing "significant obligations and liabilities." *General Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1566 (D.C.Cir.1984 *en banc* ), *cert. denied, General Motors Corp. v. Thomas*, 471 U.S. 1074, 105 S.Ct. 2153, 85 L.Ed.2d 509 (1985). Since this circuit enjoys jurisdiction to review many administrative decisions, it frequently has distinguished legislative from interpretative rules. In *General Motors Corp. v. Ruckelshaus*, 742 F.2d 1561 (D.C.Cir.1984 *en banc* ), *cert. denied, General Motors Corp. v. Thomas*, 471 U.S. 1074, 105 S.Ct. 2153, 85 L.Ed.2d 509 (1985), the court reviewed whether the EPA could issue by mere transmittal a rule requiring manufacturers to recall and repair cars more than five years old or with more than 50,000 miles.

Although the Clean Air Act rather than Medicare there was at issue, General Motors like Hampton argued that the agency (EPA) could not issue a rule (recall of older cars) without notice and comment. The *General Motors* court found that the rule there at issue only reminded auto dealerships' of the breadth of their duty to insure that car fleets complied with the Clean Air Act's emission requirements and, as such, was interpretive rather than substantive.

In 1987, the circuit court specifically visited Medicare when it considered whether rules describing the duties of the physician peer-review organizations that under the 1986 tax reform act were to report to HHS concerning hospitals making excessive Medicare reimbursement claims were interpretive or legislative. *American Hosp. Ass'n v. Bowen*, 834 F.2d 1037 (D.C.Cir. 1987).

The court found that Congress created the APA exceptions to the notice and comment requirement for interpretative and procedural rules to "preserve agency flexibility in dealing with limited situations where substantive rights are not at stake ... to accommodate situations where the policies promoted by public participation in rulemaking are outweighed by the countervailing considerations of effectiveness, efficiency, expedition, and reduction of expense." *American Hospital*, 834 F.2d at 1045 (citation omitted).

The court of appeals specifically held that an agency may issue an interpretive rule when it needs to:

" 'explain ambiguous terms in legislative enactments without having to undertake cumbersome proceedings ... Interpretive rules are statements as to what administrative officials think the statute or regulation means.' " *Gibson Wine Co.*

---

11. *See United States v. Picciotto*, 875 F.2d 345 (D.C.Cir.1989) (Park Service must promulgate rules restricting camping in Lafayette Park using notice and comment procedure); *Southern California Aerial Advertisers Ass'n v. FAA*, 881 F.2d 672, 679 (9th Cir.1989) (no private flying along beaches near Los Angeles International Airport); and *San Diego Air Sports Center v. FAA*, 887 F.2d 966, 969 (9th Cir.1989) (no parachuting near San Diego International Airport); *Jerri's Ceramic Arts, Inc. v. Consumer Product Safety Comm'n*, 874 F.2d 205 (4th Cir.1989) (agency bars sales of toys with cloth parts small enough for toddlers to swallow).

*v. Snyder,* 194 F.2d 329, 331 (D.C.Cir. 1952).

The court then reviewed its decisions distinguishing interpretative from legislative rules and found the primary difference between the two to be that interpretative rules remind parties of existing duties, while legislative rules announce new ones. *Cabais v. Egger,* 690 F.2d 234, 238 (D.C.Cir.1982). This future looking-reminder of current duties distinction divides the categories, while the degree of financial impact that a rule might have upon the public does not determine its legislative or interpretative nature. *American Postal Workers Union v. USPS,* 707 F.2d 548, 560 (1983), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984).

The court concluded that the interpretative rule's critical feature is "that it covers agency actions that do not themselves alter the rights or interests of parties, although it may alter the manner in which parties present themselves or their viewpoints to the agency." *American Hospital,* 834 F.2d at 1047, quoting *Batterton v. Marshall,* 648 F.2d 694, 707 (D.C.Cir.1980).

After this thorough review of the interpretative rule exemption to the notice and comment requirement, the court still found that the rules there at issue described an intricate plan of action and housekeeping for the peer review organizations to follow in investigating hospital fraud claims instead of restating part of the Medicare statute or regulations. Thus, the court concluded that the statements fell within the procedural rather than interpretative rule exemption to the notice and comment requirement. Relevant to the Hampton inquiry is the *American Hospital* court's statement that both exempt types of rules—interpretative and procedural—merely described ways to enforce the underlying statute, as harsh as it may be, rather than enforce new obligations upon hospitals themselves:

> "At worst, Manual IM 8502 burdens hospitals by (1) making it more likely that their transgressions from Medicare's standards will not go unnoticed and (2) imposing on them the incidental inconve-niences of complying with an enforcement scheme. The former concern in patently illegitimate: Congress' very purpose in instituting peer review was to crack down on reimbursement for medical activity not covered by Medicare." *American Hospital,* 834 F.2d at 1051.

Since, as plaintiff noted often in its briefs and exhibits, the Reagan era HHS sought to cut Medicare costs vigorously through changes in reimbursement formulae, this circuit and then the Supreme Court revisited Medicare soon after issuance of the *American Hospital.* In *Georgetown Univ. Hospital v. Bowen,* 821 F.2d 750, 752 (D.C.Cir.1987), *aff'd, Bowen v. Georgetown University Hospital,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988), HHS by transmittal of an interpretative rule in 1981 tried eliminating wages paid to hospital nurses and aides at federal hospitals from the national Medicare formula for reimbursement of such wage expenses. On the first review, the circuit court held that eliminating the federal wage rates substantively altered the formula which the agency must announce with full notice and comment protection. The agency then followed the notice and comment process in 1984 to promulgate the rule, and its attempt to apply it retroactively to the cost reporting year 1981 is discussed *infra.*

Relevant in this section of the opinion is only whether the addition of the provision making only "contractually committed" FDA unavailable in PRM § 226 has a substantive effect analogous to the wage rule in *Georgetown Hospital* or merely restates an unpleasant effect of underlying new statute as in *American Hospital.* The court finds that the new rule merely restates the HCFA position in many administrative adjudications and Blue Cross Administrative Bulletins interpreting the "availability" standard. Since "availability" was never a formula with components to delete or add like the wage reimbursement formula in *Georgetown Hospital,* the court in fact finds the issuance of an interpretation restating the HCFA view helpful to providers in reminding them of the standard with only, and probably less, indirect

financial effect than the *American Hospital* peer review plan.

### *Whether agency promulgated a legislative rule by adjudication?*

██ The plaintiff argues that even if PRM § 226, newly issued, merely would restate hospitals' duties under existing Medicare statutes and regulations concerning FDA availability for capital spending and when borrowing was necessary, the agency between 1968 through 1983 established through adjudication a standard deeming borrowing necessary when prudent, and FDA unavailable if the hospital feared it would face capital expenses soon that still were not current obligations. When an agency creates any such substantive standard, such as the prudence one alleged here, it can revoke it only through APA notice and comment rulemaking. *See* 5 U.S.C. § 551(5); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (both promulgation and revocation of substantive rules subject to notice and comment and arbitrary and capricious judicial review). The defendant counters that the HCFA administrative adjudications between 1968 and 1983 did not establish any "prudence" standard deeming borrowing necessary when interest rates were low when FDA was available.

To support the contention, the defendant first notes that in March 1982, the plaintiff's own accounting firm of Coopers & Lybrand sent the Hampton Board an analysis of the intensive care unit construction plan. Coopers & Lybrand reviewed past administrative decisions then warned that the hospital, despite having "sound and prudent reasons for making its decision not to expend its funded depreciation," might need to subordinate prudence to the Medicare regulations described in the 1970 Blue Cross Association Administrative Bulletin # 1186.[12] Reading the Bulletin strictly, the analysts concluded that Medicare likely would not view the Board's mere expression of intent to use $1,500,000.00 to redeem the 1975 bond issue nor other discussed capital plans as firm commitments, which are "binding agreements with arm's length parties to the transaction." *Deft. Mtn.,* Ex. E, p. 3.

Plaintiff dismisses the accounting firm's opinion and argues that several PRRB decisions have ordered Medicare to reimburse hospitals for interest expenses incurred when the borrowing decision was prudent. Plaintiff first cites "Henrietta Goodall," *PRRB Hearing Dec.,* No. 76–D79, Dec. 30, 1976, Medicare & Medicaid Guide (CCH) ¶ 28,337. There, the hospital had FDA of $1,170,000 in unrestricted board-designated funds but decided to assume a $340,000 5¼% FHA mortgage and borrow $500,000 by pledging $600,000 unrestricted funds as security to buy a nursing home. The PRRB found that the availability of such a low interest rate made the borrowing decision "prudent." From there, the PRRB took a holistic view of the hospital's poor financial health, including its operating losses between 1971–72, and decided that the hospital quite likely would need to use the FDA to pay capital and other expenses in the future, even though those funds were not contractually obligated to those projects at the time of the nursing home borrowing. Since the hospital had good reason to keep the FDA to pay those expenses, the PRRB said the FDA was not available, the borrowing was necessary, and the interest cost reimbursable.

Likewise, in *Research Medical Center v. Blue Cross/Blue Shield Association of Kansas, PRRB Hearing Dec.,* No. 78–D58, July 28, 1978, Medicare & Medicaid Guide (CCH) ¶ 29,230 (*Deft. Mtn.,* Ex. P), the PRRB said that a hospital that had be-

**12.** The question addressed in the 1970 Blue Cross Bulletin was whether a provider that does not use its FDA for capital purposes may receive interest expense on the outside borrowings. Blue Cross responded that interest expense on funds borrowed from the outside, "to the extent that the Provider's own funds are available, would not be considered necessary and therefore would not be allowable [i.e. reimbursable expenses]."

If creditors under a prior lending agreement had restricted the FDA, then the FDA would be unavailable to the extent of the encumbrance. *Id.*

tween $2,000,000.00 to $6,000,000.00 in its FDA could receive full Medicare reimbursement for interest incurred in borrowing $1,416,000 to build a student residence. The PRRB noted that the 4% interest rate that the Department of Housing and Urban Development offered on the loan and the hospital's "well-developed plans" to spend the FDA later made the borrowing necessary. *Id.* at 10,466–67. The Review Board added that taking out the loan rather than using the FDA was:

> "a prudent, cost-conscious management decision ... To pass up the opportunity to participate in the HUD interest subsidy grant is not logical in this situation because the funded depreciation account would be expended and extra borrowing would be necessary in the near future at a higher rate of interest." *Id.* at 10,466–67.

The HCFA Administrator affirmed the *Research Medical* decision. *See HCFA Administrator Decision*, Sept. 28, 1978, Medicare & Medicaid Guide (CCH) ¶ 29,447 (*Deft. Mtn.*, Ex. Q) ("The combination of the provider's restriction of its funded account for a capital program which is under construction, coupled with its ability to obtain a loan at less than one-half the prevailing interest rate are factors which cannot be ignored").

In *Mercy Hospital v. Blue Cross/Blue Shield Association of Western New York*, PRRB Hearing Dec. No. 79–D56, Sept. 6, 1979, Medicare & Medicaid Guide (CCH) ¶ 30,310 (*Deft. Mtn.*, Ex O), the hospital began a multi-year expansion program by taking out $6 million in 1967 (FDA balance $395,000) then $1 million (FDA balance $1,168,000) in 1969 and using $3 million of FDA. There, the PRRB chastised the intermediary for making an "objective judgment based on a Blue Cross Association Bulletin in determining whether the provider had excess funds when it incurred a mortgage in 1967 and 1969." *Id.* at 9883. The PRRB said the intermediary instead must determine availability with "a degree of subjective judgment" which considered the hospital's future equipment needs, including the fact that the hospital by 1972

had spent 1969 FDA balance on equipment. *Id.*

As he did in *Research Medical*, HCFA affirmed the first *Mercy Hospital* decision. *HCFA Administrator Decision*, Nov. 5, 1979, Medicare & Medicaid Guide (CCH) ¶ 30,318 (*Deft. Mtn.*, Ex V). HCFA's rationale was that the board of trustees' minutes "were evidence of its commitment to a long-range program," while the low interest rate on the loan afforded Medicare savings. Finally, HCFA found that the hospital was engaging in a continuous ten year project, rather than two separated by ten years.

In the 1980s the PRRB reviewed *St. Francis Community Hospital v. Blue Cross/Blue Shield of South Carolina*, PRRB Hearing Dec., No. 81–D95, Sept. 24, 1981, Medicare & Medicaid Guide (CCH) ¶ 31,552 (*Deft. Mtn.*, Ex. W). There, the hospital in 1974 obtained a federal subsidy yielding an annual interest rate of only 5.75% on a $7.2 million loan. The hospital used $930,000 of $7.2 million loan to purchase CDs used and create an FDA. From 1974–78 the hospital bought $1,317,358 worth of capital improvements using the base $930,000.00 and its interest income or by using operating funds to avoid cashing in CDs.

The PRRB held that:

> "What might have been considered excess borrowing in 1974 cannot be attributable to the funds of the provider in 1978 ... The fact that the provider paid for these purchases from operating funds rather than transferring the operating funds to the funded depreciation accounts and then paying for purchases from the funded depreciation account is of no consequence. The form of the transaction does not destroy the substance of funding depreciation for capital expenditures." *Id.* at 9709.

After HCFA reversed this decision, the court reinstated it. *St. Francis Community Hospital v. Schweiker* (D.S.C.1983), Medicare & Medicaid Guide (CCH) ¶ 34,156, *aff'd*, No. 83–1303 (4th Cir.1984) (*Deft. Mtn.*, Ex. Y).

The court agreed that Medicare should look to see whether the hospital by the cost reporting year had spent the FDA it had at the time it decided to borrow, rather than deeming the FDA level at the time of borrowing available and ignoring spenddown between that time and the cost reporting year. *Id.* at 10,187. The court also found that:

> "*Mercy Hospital* establishes that the determination of the existence of excess funds must be made 'with a degree of subjective judgment.' In this case, the Administrator has refused to exercise the requisite subjective judgment ... A provider which borrows money to fund depreciation cannot obtain reimbursement of the interest on that loan. But providers are not required to operate in a strait jacket or divest themselves of all funded depreciation in order for borrowing for capital purchases to be considered necessary borrowing." *Id.* at 10,-188.

However, the *St. Francis'* analysis of the fact that the hospital earned non-offset interest income between 1974–78 was weak: "The funds that remained in the Hospital's funded depreciation account were there because the loan restrictions required the Hospital to deposit sufficient funds from operations in those accounts in order to establish the requisite minimum levels." *Id.* at 10,188.

Had HCFA declined to review or upheld these PRRB findings concerning the determination of unnecessary borrowing, they would constitute final agency decisions and perhaps announce a legislative rule. However, HCFA frequently overruled these decisions, and inconsistency in PRRB and HCFA interpretations of the reimbursement regulations "detracts substantially from the deference normally due an agency's interpretation of its own statute and regulations." [13] *Northwest Hospital, Inc. v. Hospital Service Corp.*, 687 F.2d 985,

991 (7th Cir.1982). *quoting North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 520, 102 S.Ct. 1912, 1917, 72 L.Ed.2d 299 (1982); *General Electric Co. v. Gilbert*, 429 U.S. 125, 142–43, 97 S.Ct. 401, 411–12, 50 L.Ed.2d 343 (1976).

HCFA in 1977 reversed the PRRB's *Henrietta Goodall*, Medicare & Medicaid Guide (CCH) ¶ 28,355 (Comm'r of Social Security Feb. 28, 1977) (*Deft. Mtn.*, Ex. N), even though the parties later reinstated the PRRB decision by stipulation. In that short-lived final decision, HCFA stated that:

> The borrowings could well have been dictated by a prudent business decision, by a consensus of the Provider's Board of Trustees wishing to conserve funds for other useful projects, or for a variety of other sound reasons. It is, however, illogical to say that a loan is 'necessary' when there are ample unrestricted funds on hand without borrowing ... To hold otherwise would encourage providers to set aside their accumulated funds, let them increase through investment income and additional donations, while obtaining Medicare reimbursement for the interest on their borrowings for all the projects they decide to undertake or acquire." *Id.* at 9268.

While this court agrees with plaintiff that the stipulation robs this decision of precedential value, the fact that the parties resorted to such a settlement hints that as of 1977 no substantive rule had been enacted through adjudication.

The PRRB deadlocked in reviewing a case where the hospital board had a $421,-337 FDA which it said it would save for renovation projects then borrowed $180,000 one year and $225,000 the next to finance capital acquisition. *Bemidji Community Hospital v. Blue Cross/Blue Shield Association of Minnesota*, PRRB Hearing Dec. No. 78–D84 (Dec. 14, 1978), Medicare &

---

**13.** Even the PRRB in 1976 held that Medicare could not "prevent a provider from self-restricting its funded depreciation for a particular capital purpose," as the hospital board there had done, but intermediaries could "disallow as not necessary and proper interest expense incurred on capital borrowing to the extent funded depreciation is available for this purpose." *PRRB Hearing Dec.*, No. 76–D16 (April 30, 1976), Medicare & Medicaid Guide (CCH) ¶ 27,843 (*Deft. Mtn.*, Ex. M).

Medicaid Guide (CCH) ¶ 29,574 (*Deft. Mtn.*, Ex. L). Some of the confusion arose because the intermediary initially found the first $180,000 borrowing necessary but then challenged it, which the provider said estopped the intermediary from raising the issue again.

Although the PRRB upon review of the deadlock decided the borrowings were necessary in 1978, HCFA reversed. *HCFA Administrator Decision,* May 7, 1979, Medicare & Medicaid Guide (CCH) ¶ 29,704 (*Deft. Mtn.,* Ex. S). HCFA found the provider's failure to present evidence of "third party restrictions" committing the FDA to future construction projects at the hearing. HCFA suggested that "bond indentures, mortgages, lending agreements or any other creditor agreements" could prove that the FDA was "committed and restricted by third parties to a construction project during the cost years at issue." *Id.* at 10,211.

In the 1980s HCFA again found borrowing unnecessary when it reversed the PRRB decision in *St. Francis of South Carolina. See HCFA Administrator Decision,* Nov. 20, 1981 Medicare & Medicaid Guide (CCH) ¶ 31,673 (*Deft. Mtn.,* Ex. X). HCFA was especially concerned that permitting hospitals to accumulate FDA then seek interest reimbursement on borrowed funds would lead to Medicare "paying for the cost of borrowing" without enjoying the power to:

> "offset the investment income of the unused borrowed monies because they were deposited in the funded depreciation account. Allowing the provider to be reimbursed for the interest expense incurred in this fashion would be creating an undue benefit to the provider." *Id.* at 10,-179.

As a result of this review of the administrative interpretation of the reimbursement regulation, the court rejects the argument that HHS promulgated through adjudication a "prudence" rule deeming borrowing necessary whenever financially advantageous to the hospital even when FDA is accumulated and not firmly committed to financing other capital projects. In fact, but for inconsistencies such as the *Henriet-* *ta Goodall* stipulation reinstating the PRRB decision, the court would find the agency promulgated a "firm commitment" rule through adjudication.

**B. Whether the HCFA application of PRM § 226 comported with the APA?**

 Upon review of a final agency decision, the APA requires courts *de novo* to interpret constitutional and statutory provisions, determine the meaning or applicability of the terms of an agency action, consider whether the agency exceeded its statutory jurisdiction or authority and whether it afforded the litigant due process of law. If the court, with due account for prejudicial error, finds the agency decision to be:

1) "arbitrary and capricious"

2) "unsupported by substantial evidence" contained in a formal hearing record, or

3) unwarranted by the facts to the extent that facts are subject to trial de novo by the reviewing court,

the court must set the agency decision aside. 5 U.S.C. § 553 (1966).

The Supreme Court described both the "arbitrary and capricious" and "substantial evidence" standards in *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983):

> "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." For instance, an agency decision is arbitrary and capricious if it counters the will of Congress, ignores an important aspect of the problem, or is "so implausible that it could not be ascribed to a different view or the product of agency expertise. The reviewing court should not attempt to make up for such deficiencies."

During judicial review of HHS decisions like the one at bar, the Court also has suggested that courts grant the Secretary the significant deference that Congress gave him.

"[The Social Security Act's] Byzantine construction, as Judge Friendly has observed, makes the Act 'almost unintelligible to the uninitiated.' (cit. omitted) Perhaps appreciating the complexity of what it had wrought, Congress conferred on the Secretary exceptionally broad authority to prescribe standard for applying certain sections of the Act." *Schweiker v. Gray Panthers*, 453 U.S. 34, 43 [101 S.Ct. 2633, 2640, 69 L.Ed.2d 460] (1981) (citation omitted).

While the court will afford deference to HHS as *Schweiker* suggests, it is aware that it earlier concluded that PRM § 226 is an interpretative rule which "[u]nlike legislative rules, nonbinding policy statements carry no more weight on judicial review than their inherent 'persuasiveness commands.'" *Batterton v. Marshall*, 648 F.2d 694, 702 (D.C.Cir.1980). To determine the weight that both PRM § 226 and HCFA's application of it deserve, the court must consider "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements and all those factors which give it power to persuade, if lacking power to control." *Pfizer, Inc. v. Heckler*, 735 F.2d 1502, 1510 (D.C.Cir.1984).

The court also may discount the Secretary's conclusions to the extent that they do not demand program expertise and merely "involve characterization of ordinary business transactions, interwoven with the parties' expectations and Congress' desire that providers be afforded an opportunity to be reimbursed for the full cost of meeting the medical needs of the elderly and disabled." *Memorial, Inc. v. Harris*, 655 F.2d 905, 912 (9th Cir.1980). However, courts "may not set aside the agency's interpretation merely because another interpretation was possible and seems better, so long as the agency's interpretation is within the range of reasonable meanings that the words of the regulation admit." *Psychiatric Institute of Wash.*

*D.C. v. Schweiker*, 669 F.2d 812 (D.C.Cir. 1981).

Here, the plaintiff argues first that the agency decision was arbitrary and capricious because it retroactively applied the January 1983 transmittal to a borrowing decision that the hospital made in April 1982. The defendant asks the court instead to focus on the cost reporting year at issue, 1984, and to recall that PRM § 226 on its face applied to cost reporting years after December 1982. The defendant adds that an agency may apply a mere interpretative rule like PRM § 226 retroactively.

Alternatively, the plaintiff asks the court to recognize the spenddown principle, by which a hospital may cure an excessive borrowing by spending the FDA balance during the interim between the date of borrowing and the year the facility opens (i.e. the cost reporting year). The defendant answers that the regulations call for a final availability decision to be made as of the date of borrowing, and that permitting simultaneous spenddown of the FDA over the construction period while the account also earns interest not subject to offset is contrary to the limitations that Medicare places upon interest buildup in FDAs.

Next, the plaintiff argues that HCFA was arbitrary and capricious in failing to let it allocate the FDA among all of the capital assets that a hospital may replace or renovate. For instance, a hospital should be able to assign each depreciable asset a percentage of the total value of the institution, then allocate percentages of the FDA to each of those items. Thus, if the hospital as here wanted to replace an asset worth only 15% of the value of the plant as a whole, only 15% of the FDA would be available to spend on the project. The defendant counters that the Medicare regulations and statutes do not call for any such allocation of FDA, but rather allow the buildup of offset-free interest in the accounts to encourage spending of the entire fund for any capital needs occurring any time.

The plaintiff finally argues that HCFA's finding that the hospital had not contractu-

ally committed the FDA balance as of April 1982 to other capital projects was not supported by substantial evidence. The defendant responds that mere minutes of Board of Trustees' meetings discussing plans to spend the FDA did not constitute evidence of arms-length, third party binding contractual obligations of the FDA which make it unavailable under the regulations, and borrowing necessary to its extent. Again, the court addresses the contentions sequentially. .

### 1) *Retroactivity in applying 1983 revisions to 1982 construction decision for 1984 cost reporting year*

■ The Supreme Court discussed retroactive application of agency rules in *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988), a case in which the district court overturned HHS' 1981 attempt to change the wage reimbursement formula by interpretative rule. Controversy arose when the Secretary properly promulgated the rule in 1984, then tried applying the formula retroactively to the 1981 reporting period. The Court concluded that the retroactive application was invalid, since Congress has never granted agencies the power Congress enjoys to impose laws with reasonable secondary retroactive effect.

Here, the plaintiff says that *Georgetown Hospital* bars the HHS from applying either substantive or interpretative rules retroactively. The defendant counters that plaintiff forgets that the rule applied to cost reporting periods after December 1982, and the one at issue here, 1984, arrived a full year after transmittal of PRM § 226. The defendant adds that the "no retroactive application" principle governs only when a rule has substantive effect, which PRM § 226 does not have.

The court notes first that the January 1983 transmittal of PRM § 226 states that the "New Policy Effective Date" covers "Cost Reporting Periods Beginning on or After December 1, 1982," *Deft. Mtn.*, Ex. K, and that the cost reporting year here at issue is 1984. Technically the hospital had over one year between the provision's issuance and opening of the ICU to adjust its 1984 cost report. However, if the January 1983 transmittal substantively changed whether borrowings were necessary or not, it would affect the earlier April 1982 borrowing decision rather than the delayed reporting of expenses incurred which appear in the 1984 cost report.[14] Thus, if substantive, the court would find that *Georgetown* barred application of PRM § 226 to borrowing decisions made before the hospitals were aware of it.

Consistent with its earlier decision as to whether PRM § 226 was a rule as defined by the APA, however, the court finds that the provision merely is a minor outgrowth of earlier policy statements and HCFA adjudications since 1975. For instance, the May 11, 1970 Bulletin published by the Blue Cross Association Government Programs office. The Bulletin describes the definition of "necessary" borrowing under the statute and regulations:

> If "unrestricted depreciation funds are available to the Provider for its capital expansion needs, interest expense on funds borrowed from the outside, to the extent that the Provider's own funds were available, would not be considered "necessary" and therefore would not be allowable."

*Deft. Mtn.*, Ex. B (Jan. 17, 1990).

As the new January 1983 PRM § 226 does, the 1970 Bulletin as an example states that a provider with a $2 million unrestricted FDA planning to embark on a $4 million project who borrows the full $4 million cannot obtain interest reimbursement for the $2 million that the FDA could have provided. The 1970 Bulletin added that if $1 million of that FDA were "restricted by creditors under a prior lending agreement .. to be used only in the event of default under the prior loan," then that $1 million would be "unavailable" so that

---

14. As noted earlier, a hospital cannot claim interest reimbursement for a construction project until the facility opens, when it then may collect interest from the reporting year back to the borrowing year. Here, the 1984 cost report sought interest expense incurred between 1982 and 1984.

Medicare would reimburse interest expense on the full $3 million. *Id.*

Later, the 1981 Blue Cross/Blue Shield Administrative Bulletin # 1186 sent to Directors of Federal Programs and Reimbursement Managers notes that the FDA:

> "must be used and totally consumed within a short period of time during the construction and/or acquisition of the [capital] asset. The timeliness of expenditures is emphasized in order to ensure that the provider is not merely delaying the use of funded depreciation in order to gain a source of 'offset free' income from the funded depreciation account."

*Deft. Mtn.,* Ex. D.

However, the 1981 Bulletin applies only when a hospital uses a mix of FDA and borrowed funds to construct multi-year, multi-phase projects while here, Hampton borrowed the entire construction cost, set aside only $500,000 from its FDA into a never-used contingency account, and completed the project within two years in a single stage. Nonetheless, the court finds that the 1981 Bulletin discussed the problem of FDA accumulation of interest when not committed to capital projects, and warned that the *old* PRM § 226 required the FDA was available unless committed in an arm's length contract or an escrow, described as "a requirement of a debt instrument [that] is controlled by a third party rather than the provider; the key is that the provider's use of these funds is restricted by a third party." *Id.* at 2.

Since both the 1970 and 1981 Blue Cross Bulletins discuss the degree that a hospital must sequester its FDA to make it unavailable, it appears that PRM § 226 is a logical, minor outgrowth of that policy.

The court also notes an inconsistency in plaintiff's request that the court discount the PRM § 226 availability requirements yet asks that it find another section of the January 1983 transmittal, PRM 2160.2, which states that:

"a provider participating in the Medicare program is expected to follow sound and prudent management practices, including the maintenance of an adequate insurance program to protect itself against likely losses, particularly losses so great that the provider's financial stability would be threatened"

governs the case. The court notes that this section of the 1983 transmittal is part of a warning that Medicare will not indemnify hospitals that fail to insure themselves properly rather than a passage modifying the 1983 unnecessary borrowing policy. Thus, the court will decline the plaintiff's invitation to find both that this statement, which appears in the same 1983 transmittal that plaintiff otherwise says is unjustly applied retroactively, is binding and second, that it applies to the wholly separate discussions of FDA availability and unnecessary borrowing at PRM § 226.

Thus, the court concludes that PRM § 226 is a clarification of old Blue Cross interpretations of "availability" and "unnecessary borrowing" lacking substantive effect so that the *Georgetown University* bar upon retroactive application of agency rules is inapplicable.

### 2) *The spenddown principle*

■ Plaintiff argues that a hospital with a positive FDA balance at the time it decides to borrow for a construction project may make the FDA unavailable by spending the balance on other capital projects during the interim between the day of borrowing and the opening of the facility (the cost reporting year). The plaintiff argues that proper application of the first-in, first-out ("FIFO") [15] accounting principle applicable to FDA expenditures demands that hospitals enjoy such an opportunity to "cure" unnecessary borrowing.

The plaintiff notes that the district court of South Carolina accepted the spenddown

---

15. FIFO accounting, according to *Black's Law Dictionary,* is an "inventory flow assumption by which ending inventory cost is determined from most recent purchases and cost of goods sold is determined from oldest purchases including beginning inventory." In other words, the first deposits placed in the FDA are deemed the first withdrawn. Plaintiff contends that proper application means that the FDA balance as of the date of borrowing is deemed to be the first withdrawn, so that depletion of that balance generally occurs before the facility opens.

principle in *St. Francis*, which the court recognizes. No more or less binding is HCFA's rejection of the idea that making "capital purchases in excess of the amount of funds it had borrowed and deposited into its funded depreciation account" would change borrowings originally excessive to necessary ones. *HCFA Administrator Decision*, Nov. 20, 1981 Medicare & Medicaid Guide (CCH) ¶ 31,673 (*Deft. Mtn.*, Ex. X) at 10,179; *cf. Deft. Mtn.*, Ex. Z. *HCFA Administrator Decision* (July 13, 1989); *St. Bernard's Regional Medical Center v. Blue Cross/Blue Shield Association of Arkansas* (HCFA finds that applying FIFO rule won't cure excess borrowing when hospital used operating funds equal to FDA balance at time of borrowing for capital projects during construction period. Instead, must deem the operating funds to be part of the available FDA at the time of borrowings so that borrowing remains excessive). The court notes both that the *St. Francis* decision is not binding upon this court and that HCFA's rejection of spenddown assertions in the 1981 and recent *St. Bernard's* decisions reveals no promulgation of a spenddown rule by adjudication. Moreover, the regulations and Medicare statute say only that FIFO applies and that the hospital should make the "availability" decision as of the date of borrowing, without any reference to spenddown or cure of excess borrowing between that date and the year when the facility opens, when the reimbursement claim first is ripe. The court thus declines to apply the spenddown rule and will view any funds not contractually committed to an ongoing project as of the day of borrowing to be available.

### 3) *Whether regulations call for allocating FDA among assets before determining whether full amount of borrowing necessary and proper?*

█ The plaintiff argues that the Medicare FDA regulations permit hospitals to allocate the fund among specific depreciable hospital assets, so that here, only the percentage of the $3,480,575.00 FDA balance in 1982 attributable to the ICU in relation to the hospital's total assets would be "available" for spending on the project. To buttress the theory, Hampton trustee Mr. Eitelman told the PRRB that Hampton assumed the FDA was allocated to replace specific assets:

> "Without being a financial expert, what this told me was that the accumulated depreciation for the areas to be vacated, it showed that the value of that property was, or that space, was very minimal, at about $400,000.00" *Administrative Record* at 864.

Whatever its appeal as a general business proposition, the court finds that the plaintiff's FDA allocation theory is untenable for lack of statutory or regulatory support. In fact, the PRM provisions which have governed such transactions since 1970 state only that the FDA's cumulative value cannot exceed a hospital's actual accumulated depreciation. PRM § 226.-3.[16] That limitation on the FDA value, as well as the requirement that FDA deposits remain in the fund for six months or more, stops hospitals from depositing all operating cash into putative FDAs to earn more offset-free interest than FDAs' creators intended. Since these limitations, as well as the "unnecessary borrowing" and availability regulations, fail to even hint that hospitals should allocate it, the court rejects plaintiff's argument.

### 4) *Evidence of contractual commitments of the FDA*

█ The plaintiff contends that no substantial evidence in the administrative record supports HCFA's unnecessary borrowing determination. Chiefly, Hampton argues that HCFA did not afford adequate weight to the hospital's firm commitment of its FDA to the 1985 $1.5 million balloon payment and the CAT scan/third floor renovation projects between 1982–1984, and claims that PRRB found as a factual matter that the FDA commitments were firm and deserving of deference.

---

**16.** The FDA "cannot exceed its total cumulative allowable depreciation expense .. from the date of acquisition of all provider depreciable assets used to provide patient care services under the Medicare program." PRM § 226.3.

In support of the proposition that HCFA and this court owe deference to PRRB fact-finding, the plaintiff cites *Eskaton American River Hospital v. Aetna/Blue Cross Association of California, HCFA Administrator Decision*, Nov. 27, 1989, Medicare & Medicaid Guide (CCH) ¶ 38,279 (*Pltf. Mtn. in Opp.*, Ex. 6). There, HCFA noted that PRRB as part of its authority to review reimbursement decisions could determine whether "costs were reasonable, even though they exceeded the [new statutory] limits. The PRRB is the finder of facts in this regard." Plaintiff likewise notes that in *Scotland Memorial Hospital v. Blue Cross/Blue Shield Association of North Carolina, HCFA Administrator Decision*, Nov. 8, 1984, Medicare & Medicaid Guide (CCH) ¶ 34,410, HCFA stated that the PRRB had the authority to find as a fact that a hospital used similar procedures to collect both Medicare and non-Medicare patients' debts: "The conformity of the provider's debt management procedures with the [regulation's] requirements is primarily a question of fact. It is well within the Board's competence to make such factual determinations." *Id.* at 9069.

However, this court finds that whether the FDA commitments were firm or not is a matter of law that it may review *de novo*, even though it will defer to the PRRB factual findings as to what the Hampton Board of Trustees wrote or said when commencing the ICU/CCU construction project. *Memorial, Inc. v. Harris*, 655 F.2d 905, 910 (9th Cir.1980) (a court "must still correct any misapplications [sic] of the law by the PRRB").

PRM § 226.4 describes when borrowing according to specific Medicare principles, not general business ones, is necessary, stating that:

"Available funded depreciation must be withdrawn and used before resorting to borrowing for the acquisition of depreciable assets or other capital purposes, except that, when available funded depreciation is insufficient to cover the total cost of a major construction project and borrowing is necessary ... all available funded depreciation need not be withdrawn and applied to construction cost prior to borrowing. Because it is frequently difficult to time a bond offering or other borrowing to coincide with the exhaustion of available funded depreciation, it is sufficient if available funded depreciation is contractually committed to and expended during the course of construction."

Here, the plaintiff offered the testimony of Hampton Trustees who described what occurred during the Board meetings preceding the construction of the ICU/CCU. When asked whether the hospital's plans early in the 1980s to construct the ICU, purchase the CAT scanner, alter the Hampton emergency entrance and parking area, and renovate the third floor, one trustee testified that:

"The list of projects, we thought at the time [1978], were absolutely essential to give our hospital the major elements for long-term viability, including such basic advantages as the ability to recruit physicians. So no, this was not a wish list. This was an absolute must list of projects that would literally bring us into the modern era that we found ourselves in." *Administrative Record* at 653.

A second trustee testified as to what the Hampton Board said during its meetings between 1980 to 1982 about spending the FDA:

"And at least two or three times in our minutes the first years I was there the board made mention of the fact that our cash reserves had to be adequate to make that million-and-a-half dollar balloon payment." *Administrative Record* at 876.

As to what the trustees did at the 1982 meeting before commencing the ICU project, another trustee testified that:

"Upon recommendation from Administration, a motion was made and seconded to fund depreciation in the amount of $1,000,000 and restrict the monies for the purpose of OR Renovations, new ICU/CCU, parking lot improvements or additions, and a balloon mortgage payment due in 1985. The motion carried." *Ap-*

*pendix to Pltf. Mtn., Administrative Record* at 2780.

The court finds that although this testimony may show that the Board felt the projects were essential as of 1982, it does not reveal any contractual commitments to allocate the entire FDA as of April 15, 1982. The court's specific findings as to whether the FDA was contractually committed are as follows:

1) **The ICU/CCU $500,000.00 contingency fund:** The court finds that the Hampton Board's decision to use the FDA to satisfy the bond prospectus requirement that the hospital create a $500,000 contingency fund did constitute a pre-borrowing FDA commitment sufficiently "contractual" to make that amount of FDA unavailable for the project. The court reaches the conclusion because the hospital placed the money in a segregated fund and plainly did so before the borrowing, since creation of the fund was a contractual prerequisite to the issuance of the bonds.[17]

2) **Pre-borrowing commitments of FDA to the third floor renovation and CAT scan purchase:** The court will apply the standard that HHS and Blue Cross promulgated in the 1981 Administrative Bulletin # 1186, which says that a hospital may commit the FDA for spending of FDA on multi-year, multi-phase projects, and that Medicare reviewers should consider such transactions a single lump commitment of FDA. Here, the court finds that Hampton *before* April 1982 had, by virtue of executing purchase orders and making payments to contractors, begun the CAT scan purchase, third floor renovation, and purchase of miscellaneous equipment and, according to the 1981 Blue Cross Bulletin # 1186 standard, had contractually committed FDA to completing them in the following amounts: third floor renovation ($321,665), the CAT scan ($207,453), and major movable equipment ($198,585), for a total com-

mitment of $727,703.00. *See PRRB Hearing Dec.* No. 89–D15 (Jan. 9, 1989) (*Deft. Mtn.*, Ex. I at 18). Again, the purchase orders and invoices are the dispositive proof lacking as to the other transactions.

3) **The 1985 $1.5 million balloon payment for the 1975 bond issue:** The court finds that Hampton betrayed its supposed commitment of a full $1.5 million of its FDA to satisfaction of the balloon as of April 15, 1982 when its trustee at the PRRB hearing testified that the Board funded depreciation in the amount of only *$1 million* in 1982 to satisfy the balloon, the $500,000 contingency fund, and other capital debts. *App. to Pltf. Mtn.,* Administrative Record at 2780.

The trustee's statement reveals that the Board even unilaterally had not committed $1.5 million of the 1982 FDA balance to satisfy that 1985 debt. In all likelihood the Board expected an investment of less than $500,000 [18] combined with other available funds in the FDA to earn sufficient interest between 1982 and 1985 so that by November 1985, the Board then could easily use FDA to pay off $1.5 million debt.

Moreover, the hospital did not show the court any evidence of creation of a separate account analogous to the 1982 contingency one, nor any agreement with its 1975 lenders whereby they demanded a set aside of cash as of April 1982 to ensure satisfaction of the balloon analogous to the 1982 bond prospectus. Thus, the court finds the board expressed no more than a diffuse unilateral concern that the balloon payment be satisfied by 1985 so that the $1.5 million of the $3,480,575.00 FDA was available for spending on the ICU project.

### III. *Conclusion*

The court finds that Hampton's borrowing was unnecessary in the amount of $2,252,872.00 ($3,480,575 FDA − $500,000

---

17. Whether that $500,000 later became available when the ICU/CCU later was completed on time without cost overruns is matter for another court to decide. For purposes of this case, the court looks only to FDA availability as of April 15, 1982 and finds that the hospital had committed it as of that date.

18. Here the court deducts the $500,000 spent to create the 1982 contingency fund from the $1 million commitment to find that no more than $500,000 remained.

contingency fund — $727,703 pre-borrowing capital commitments = $2,252,872.00), so that any interest expense claimed on that amount is not reimbursable. The court remands the matter to the fiscal intermediary with instructions that it reimburse Hampton for interest incurred in borrowing the $1,227,703.00 ($500,000 + $727,-703 = $1,227,703), which represents the FDA sum unavailable as of April 1982 for spending upon the ICU/CCU project.

A separate order shall be issued this date.

## ORDER AND JUDGMENT

For the reasons set forth in the court's Memorandum Opinion issued this date, it is hereby

ORDERED, that defendant's motion for summary judgment is hereby granted in part and denied in part; and it is

FURTHER ORDERED, that plaintiff's cross-motion for summary judgment is hereby granted in part and denied in part; and it is

FURTHER ORDERED, that judgment is hereby entered remanding this action to defendants for reimbursement of plaintiff for interest expenses incurred in borrowing $1,227,703.00 according to the Medicare formula prevailing in the 1984 cost reporting year. All other claims are DISMISSED.

Final judgment having been entered, this case now stands closed on the dockets of this court.

SO ORDERED.